UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN -- SOUTHERN DIVISION

IAN LYNGKLIP
    Plaintiff

-vs-                                       Case No.
                                               Hon.

CREDIT CARD SERVICES, and
JOSH DOE
    Defendants.

## COMPLAINT & JURY DEMAND

*Ian Lyngklip states the following claims for relief:*

### Jurisdiction

1. This court has jurisdiction under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227.

2. The claims presented under the TCPA present federal questions for purposes of 28 U.S.C. §§1331,1332(a).

3. This court may exercise supplemental jurisdiction over the related state law claims arising out of the same nucleus of operative facts which give rise to the Federal law claims.

4. Mr. Lyngklip resides in the State of Michigan.

5. No member of Credit Card Services is believed to reside in the State of

Michigan.

6. Diversity of citizenship exists between the parties.

7. The amount in controversy - including actual damages, statutory damages, treble damages and attorney's fees - exceed $75,000.

## Parties

8. The Plaintiff to this lawsuit is Ian Lyngklip ("Plaintiff" or "Mr. Lyngklip"), an individual who resides in Huntington Woods, Michigan.

9. The Defendants are:

    a. Credit Card Services ("CCS"), a foreign company doing business in Michigan.

    b. Josh Doe, ("Josh"), in his capacity as supervisor of Credit Card Services. Upon information and belief, Josh owns/manages/operates an Automatic Telephone Dialing System ("ATDS") as defined by the TCPA 47 U.S.C. §227(a)(1) and 47 C.F.R. 64.1200(f)(2) and regularly uses instrumentalities of interstate commerce and an ATDS to autodial and deliver prerecorded voice messages to Mr. Lyngklip for purposes of selling him credit card interest rate reduction services.

## Venue

10. The transactions and occurrences which give rise to this action occurred in

Oakland County, Michigan.

11. Mr. Lyngklip resides in Oakland County, Michigan.

12. Venue is proper in the Eastern District of Michigan.

## General Allegations

13. Mr. Lyngklip maintains a cell phone in order to maintain personal contacts with family, friends, and as a device through which he can seek emergency help.

14. The service for his cell phone is via a "cellular telephone service" as described in 47 U.S.C. § 227(b)(1)(A)(iii).

15. In or around 2015, Credit Card Services began calling Mr. Lyngklip on his cellular phone.

16. When answering these calls, Mr. Lyngklip would hear "dead air," a brief pause, and a prerecorded messages offering to lower his interest rates on his credit cards, and identifying the caller as Card Services.

17. On July 17, 2017, Mr. Lyngklip received another call from Credit Card Services and the phone number that appeared on his phone's caller ID was (440) 219-0391.

18. After answering the call, Mr. Lyngklip heard a prerecorded message, again offering to lower his interest rates and identifying the caller as Card Services.

19. After delivery of that prerecorded message and waiting on the line, Mr.

Lyngklip was connected with a live operator who solicited credit card interest rate reduction services.

20. That operator identified himself as "Chad Morgan."

21. During that call, Mr. Morgan stated the reason for his call was because Mr. Lyngklip has been making timely payments, he was now entitled to a new lower interest rate and that Mr. Morgan was calling to offer Mr. Lyngklip a lowered interest rate on his credit card.

22. During that call, Mr. Lyngklip asked Mr. Morgan to identify which card he was referring to, which Mr. Morgan responded that they ("Credit Card Services") worked directly with banks such as "Bank of America, Chase, City Bank, Capital One, Credit One, Credit Union, USAA" and store cards as well such as "Walmart, Target, Best Buy" and that those institutions are their "marketing partners."

23. During that call, Mr. Morgan asked Mr. Lyngklip to identify the credit card with the highest interest rate and to disclose the outstanding balance on that card and the percentage Mr. Lyngklip was currently paying.

24. During that call, Mr. Morgan stated that his service could lower Mr. Lyngklip's interest rate from 16% to 6.9% or the minimum of 0.00%.

25. During that call, Mr. Lyngklip asked Mr. Morgan, twice, what the charge was

for such a service which Mr. Morgan provided, twice, that there was zero cost to the consumer, no "out of your pocket expenses" and that Credit Card Services is "paid directly from the rates that you're getting" and further that Credit Card Services is "paid by the banks not you sir" and that Credit Card Services gets "paid by the differences in the rate that you are getting."

26. During that call, Mr. Lyngklip asked Mr. Morgan to identify the company name that he was calling on behalf of, which Mr. Morgan identified as "Credit Card Services."

27. During that call, Mr. Lyngklip asked Mr. Morgan to identify the location he was calling from, which Mr. Morgan identified as Orlando, Florida.

28. During that call, Mr. Morgan asked Mr. Lyngklip to disclose his full credit card number and repeatedly assured Mr. Lyngklip that nothing would be charged to his credit card but that he needed the credit card number to "verify balance."

29. During that call, Mr. Morgan asked Mr. Lyngklip to confirm his zip code, the last four digits of his social security number, and his phone number.

30. During that call, Mr. Morgan asked Mr. Lyngklip to disclose his email address.

31. During that call, Mr. Lyngklip asked Mr. Morgan repeatedly to send a test email to his email address to verify Mr. Morgan had correctly recorded it, which Mr. Morgan repeatedly declined to do stating that once Mr. Lyngklip

was qualified he would be transferred to the "financial advisor" who would calculate the new interest rate and then send materials via email.

32. During that call, Mr. Lyngklip asked Mr. Morgan what exactly he needed his information for, which Mr. Morgan stated it was his "job to qualify" Mr. Lyngklip.

33. During that call, Mr. Morgan advised that he had received a response from the "verification department" and that Mr. Lyngklip did owe $7,278.61 on his Chase card.

34. During that call, Mr. Morgan asked if Mr. Lyngklip had any other cards that he would like to lower his interest rate on.

35. During that call, Mr. Morgan advised Mr. Lyngklip that he was qualified for the new rate and then transferred him to another representative named "Josh."

36. During that call, Josh asked Mr. Lyngklip to identify his first and last name.

37. During that call, Mr. Lyngklip asked Josh to provide a phone number where a natural person would be available to answer his call, and Josh provided "1 (866) 449-6499" and his extension "844."

38. During that call, Mr. Lyngklip asked Josh if he was with Card Services and Josh confirmed he was.

39. During that call, Mr. Lyngklip asked Josh to identify a company website and

after asking repeatedly, Josh provided "www.creditcardservices.com."

40. During that call, Mr. Lyngklip asked Josh to identify the location he was speaking to him from, which Josh identified as New York.

41. During that call, Josh acknowledged that Mr. Lyngklip had a Visa card ending in xxxx and asked if Mr. Lyngklip had any other cards with balances.

42. During that call, Josh advised Mr. Lyngklip that the service would net Mr. Lyngklip a "low fixed rate for life."

43. During that call, Mr. Lyngklip asked how Josh could secure for him a "low fixed rate for life", to which Josh advised that once he transferred him over to his financial advisor they would call the bank together to effectuate that change.

44. During that call, Josh guaranteed Mr. Lyngklip "6.99% on average but we are going to try to get you as low as 0.00%."

45. During that call, Mr. Lyngklip asked how Josh could secure 0.00%, to which Josh advised that once Josh transferred Mr. Lyngklip to his senior advisor, "they work for you, so they know all the ways of getting you the lowest possible rate," and "that's their job to go over that with you."

46. During that call, Mr. Lyngklip asked Josh what his position was because it was his understanding that Josh was the financial advisor, to which Josh responded that he was not the financial advisor, but the "supervisor at credit card services"

and would be going over everything they were doing.

47. During that call, Josh advised that by participating in the service, Mr. Lyngklip would be "almost cutting monthly payments in half."

48. During that call, Josh advised that additional cards could be added later, up to 10 for Mr. Lyngklip and 5 additional cards for family members.

49. During that call, Josh advised that Mr. Lyngklip was averaging over 16% interest currently and that on the total debt he owes he is "giving the banks over $2,200.00 in interest and finance charges every 12 months" due to the higher interest rate.

50. During that call, Josh advised that to participate in the service Mr. Lyngklip would need to pay the fee of $996.00 in ten payments, spread across five months, a payment of $199.20 per month.

51. During that call, Mr. Lyngklip asked Josh if $996.00 was the fee charged to every consumer for participating in the service, which Josh advised that each consumer pays a different fee based on the "debt to credit ratio."

52. During that call, Mr. Lyngklip asked Josh to send him something over in writing which he refused to do.

53. During that call, Mr. Lyngklip asked Josh how to get qualified, to which Josh responded that as the supervisor he had already qualified Mr. Lyngklip and that

Mr. Lyngklip's information was secured directly from lenders.

54. During that call, Mr. Lyngklip asked Josh if this was a credit report based approval, to which Josh responded that there was no credit check and that because he was in good standing with his lenders and making timely payments he was qualified.

55. During that call, Mr. Lyngklip asked if the credit card rate would be reduced away, to which Josh replied that the credit card rate would be reduced right away, even that same day.

56. During that call, Mr. Lyngklip told Josh that he needed to think about it and could he still participate tomorrow, to which Josh replied that Mr. Lyngklip needed to accept within the next hour because "this is not a promotional rate" but rather "this is a low fixed rate" he must either "decline the offer or apply the rates" and that if he declined the offer, Josh would send the file back to the lenders and they would take it from there.

57. During that call, Mr. Lyngklip told Josh that he needed some time to think about it and asked Josh and Credit Card Services not to call him again.

58. Later that same day, July 17, 2017, Credit Card Services called Mr. Lyngklip again.

59. On July 18, 2017, Credit Card Services placed two more auto-dialed calls to

Mr. Lyngklip and conveyed a prerecorded messages with phone numbers (323) 831-8493 and (919) 893-0961 appearing on Mr. Lyngklip's caller ID.

60. Credit Card Services has called Mr. Lyngklip multiples times a week.

61. Credit Card Services has called Mr. Lyngklip more than 100 times.

62. At all times material and relevant hereto, Credit Card Services used, controlled and/or operated "automatic telephone dialing systems" as defined by the TCPA, 47 U.S.C. § 227 (a)(1) and 47 C.F.R. 64.1200(f)(1).

63. Credit Card Services placed these calls using an automatic telephone dialing system.

64. Credit Card Services caused their source phone number to be disguised as another phone number to prevent Mr. Lyngklip from being able to return any calls to the phone number or discover the true identity of the callers.

65. During those calls, Credit Card Services conveyed a message with an artificial voice or a prerecorded message for Mr. Lyngklip about credit card interest rate reduction.

66. Those recordings did not offer Mr. Lyngklip an option to press to decline future phone calls.

67. Credit Card Service calls have not been for an emergency purpose.

68. Mr. Lyngklip does not know Credit Card Services.

69. Mr. Lyngklip did not seek out services from Credit Card Services.

70. Mr. Lyngklip did not consent to calls from Credit Card Services.

71. Mr. Lyngklip asked Credit Card Services to stop calling him.

72. Credit Card Services continued to place calls to Mr. Lyngklip using their automatic telephone dialing system even after he expressly told them to stop calling him.

73. Credit Card Services continued to convey messages to Mr. Lyngklip using an artificial voice or a prerecorded message even after he expressly told them to stop calling him.

## COUNT I – Telephone Consumer Protection Act of 1991 ("TCPA") and 47 C.F.R. 16.1200 *et seq.* (Defendants)

74. Mr. Lyngklip incorporates the preceding allegations by reference.

75. The central business mission of Defendants is to solicit consumers to purchase their services using the United States mail service, telephone, telegram or other instrumentalities of interstate commerce.

76. At all times material and relevant hereto, Defendants used, controlled and/or operated "automatic telephone dialing systems" as defined by the TCPA 47 U.S.C. § 227(a)(1) and 47 C.F.R. 64.1200(f)(2).

77. Mr. Lyngklip never gave Defendants consent to call his cellular phone number using an auto-dialer or to deliver prerecorded voice messages to him on his

cellular phone.

78. Defendant's actions negligently violated the TCPA, 47 U.S.C. § 227 *et seq.*, in relation to Mr. Lyngklip.

79. As a result of Defendant's negligent violations of the TCPA, Mr. Lyngklip may recover statutory damages of $500.00 for each and every violation of the statute during each and every call.

80. Alternatively, Defendant's actions knowingly or wilfully violated the TCPA in relation to Mr. Lyngklip.

81. As a result of Defendant's willful violations of the TCPA, Mr. Lyngklip may recover statutory damages of up to $1,500.00 for each and every violation of the statute during each and every call.

### COUNT II – Michigan Home Solicitation Calls Act ("MHSCA")
### (Defendants)

82. Mr. Lyngklip incorporates the preceding allegations by reference.

83. Mr. Lyngklip is a "person" as that term is defined by MHSCA §445.111(k).

84. Mr. Lyngklip is a "residential telephone subscriber" as that term is defined by MHSCA §445.111(l).

85. At all times material and relevant hereto, Defendants and their agents placed a telephonic call to Mr. Lyngklip to sell him their services, including alleged credit card interest rate reduction, of more than $25.00.

86. At all times material and relevant hereto, Defendants called Mr. Lyngklip by telephone to solicit him to purchase its services, including alleged credit card interest rate reduction services within the meaning of the MHSCA §445.111(m).

87. Mr. Lyngklip received the telephonic calls for solicitation of services, including alleged credit card interest rate reduction services of more than $25.00 from Defendants while he was at his residence.

88. At all times material and relevant hereto, Defendants and their agents' communications to Mr. Lyngklip qualify as "home solicitation sales" as that term is defined by MHSCA §445.111(a).

89. At all times material and relevant hereto, Defendants and their agents are "telephone solicitors" as that term is defined by MHSCA §445.111(n) and used automated dialing and announcing devices as those terms are defined by MHSCA §445.111(g).

90. At all times material and relevant hereto, Defendants and their agents made home telephonic solicitation calls to Mr. Lyngklip using in whole or in part a recorded message in violation of MHSCA §445.111 Sec.1a (1).

91. At all times material and relevant hereto, Defendants and their agents made telephonic home solicitation calls to Mr. Lyngklip whereby the callers

intentionally blocked or otherwise interfered with the caller ID function on Mr. Lyngklips phone in violation of MHSCA §445.111 Sec. 1b(3).

92. At all times material and relevant hereto, Defendants and their agents failed to comply with the requirements of MHSCA §445.111 Sections 1(a) and 1(b) in violation of MHSCA §445.111 Sec. 1c(f).

93. Defendants's actions knowingly or wilfully violated the MHSCA in relation to Mr. Lyngklip.

94. As a result of Defendants's willful violations of the MHSCA, Mr. Lyngklip may recover statutory damages of up to $250.00 for the violation of the statute and reasonable attorney fees.

## Demand for Jury Trial

95. Mr. Lyngklip demands trial by jury in this action.

## Demand For Judgment for Relief

96. *Accordingly, Mr. Lyngklip requests that the Court grant:*

   a. *Statutory damages,*

   b. *Treble damages,*

   c. *Statutory costs and attorney's fees, and*

   d. *Any other relief deemed proper by this Court.*

   Respectfully Submitted,

By:  s/ Sylvia Bolos  
Sylvia Bolos (P78715)  
LYNGKLIP & ASSOCIATES  
CONSUMER LAW CENTER, PLC  
Attorney For Ian Lyngklip  
24500 Northwestern Highway, Ste. 206  
Southfield, MI 48075  
(248) 208-8864  
<u>SylviaB@MichiganConsumerLaw.com</u>

Dated: July 19, 2017